IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| JERRY HARLESS, | ) | No. 80091-4-I |
| Appellant, | ) ) | |
| | ) | DIVISION ONE |
| v. | ) ) | UNPUBLISHED OPINION |
| CENTRAL PUGET SOUND GROWTH MANAGEMENT HEARINGS BOARD, | ) ) ) | |
| Defendant, | ) ) | |
| KITSAP COUNTY, | ) ) | |
| Respondent. | ) ) | FILED: November 18, 2019 |

SMITH, J. — Jerry Harless is a Kitsap County resident who challenged Kitsap County's 2016 comprehensive plan update before the Central Puget Sound Growth Management Hearings Board (Board). The Board dismissed Harless's challenge, which alleged that Kitsap County (County) violated various provisions of the Growth Management Act (GMA), chapter 36.70A RCW.

The Board did not err to the extent that it dismissed Harless's challenge under RCW 36.70A.040, which requires that development regulations be consistent with and implement the comprehensive plan. But that GMA provision was not the sole basis for Harless's challenge to the updated plan, and the Board either did not consider Harless's additional arguments or did not articulate its basis for dismissing them as required by RCW 36.70A.290(1). Therefore, we affirm in part and remand to the Board to address Harless's challenge to the

extent that it was based on the other GMA provisions cited in Harless's issue statement before the Board, i.e., RCW 36.70A.020(1)-(2), .070, .110, .115, and .130, or to more thoroughly articulate its basis for dismissal under those provisions.

BACKGROUND

Relevant GMA Concepts

The County plans under the GMA. "The central purpose of the GMA is to coordinate land use, zoning, subdivision, planning, development, natural resources, public facilities, and environmental laws into one scheme in order to concentrate new development in compact urban growth areas, while conserving environmentally critical land and valuable natural resources." Ferry County v. Growth Mgmt. Hr'gs Bd., 184 Wn. App. 685, 727, 339 P.3d 478 (2014). To that end, "[t]he GMA requires counties to develop a 'comprehensive plan,' which sets out the 'generalized coordinated land use policy statement' of the county's governing body." Woods v. Kittitas County, 162 Wn.2d 597, 608, 174 P.3d 25 (2007) (internal quotation marks omitted) (quoting former RCW 36.70A.030(4) (1997)). The comprehensive plan must specify "an urban growth area or areas within which urban growth shall be encouraged and outside of which growth can occur only if it is not urban in nature." RCW 36.70A.110(1). The urban growth area (UGA) designates "areas and densities sufficient to permit the urban growth that is projected to occur in the county . . . for the succeeding twenty-year period" based on a population projection made for the county by the State's Office of Financial Management (OFM). RCW 36.70A.110(2).

"Along with a comprehensive plan, the GMA requires counties to adopt development regulations that are 'consistent with and implement the comprehensive plan.'" Woods, 162 Wn.2d at 609 (quoting former RCW 36.70A.040(3)(d), (4)(d) (2000)). "Development regulations" include, but are not limited to, zoning ordinances. Former RCW 36.70A.030(7) (2012). Unlike a comprehensive plan, which serves as a "'guide' or 'blueprint'" for making land use decisions, development regulations "are specific controls placed on development or land use activities by a county or city." Citizens for Mount Vernon v. City of Mount Vernon, 133 Wn.2d 861, 873, 947 P.2d 1208 (1997) (quoting Barrie v. Kitsap County, 93 Wn.2d 843, 849, 613 P.2d 1148 (1980)); WAC 365-196-800(1). For example, the County's zoning code establishes, among other things, the allowed uses within each zone; setback, parking, and landscaping requirements within a particular zone; and, most importantly for this case, the range of allowed densities, expressed in dwelling units per acre (du/ac), for each residential zone.

The GMA requires counties to continually review their comprehensive plans and development regulations. RCW 36.70A.130(1)(a). Specifically, RCW 36.70A.130 establishes a schedule whereby each county in Washington "shall take legislative action to review and, if needed, revise its comprehensive plan and development regulations to ensure the plan and regulations comply with the [GMA]." RCW 36.70A.130(1)(a). As part of this review, the county "shall review . . . its designated [UGAs], and the densities permitted within both the incorporated and unincorporated portions of each

[UGA]." RCW 36.70A.130(3)(a). Additionally, "[t]he county comprehensive plan designating [UGAs], and the densities permitted in the [UGAs] . . . shall be revised to accommodate the urban growth projected to occur in the county for the succeeding twenty-year period." RCW 36.70A.130(3)(b). To this end, in Thurston County v. Western Washington Growth Management Hearings Board, our Supreme Court held that "although the GMA does not explicitly limit the size of a UGA, . . . a county's UGA designation cannot exceed the amount of land necessary to accommodate the urban growth projected by OFM, plus a reasonable land market supply factor." 164 Wn.2d 329, 351-52, 190 P.3d 38 (2008). In so holding, the court recognized that "[i]f the size of a UGA is not limited, rural sprawl could abound," contrary to the GMA's stated goal of reducing sprawl. Thurston County, 164 Wn.2d at 351; see also RCW 36.70A.020(2) (setting forth the GMA's sprawl reduction goal).

To estimate a UGA's capacity to accommodate projected population over the 20-year planning period, the County prepares a "land capacity analysis" (LCA). WAC 365-196-310(4)(b)(ii). "The first step in conducting a[n LCA] is to determine the 'net . . . acreage' available for development within an existing or proposed UGA." Brent D. Lloyd, Accommodating Growth or Enabling Sprawl? The Role of Population Growth Projections in Comprehensive Planning under the Washington State Growth Management Act, 36 GONZ. L. REV. 73, 113 (2000/2001) (alteration in original) (quoting Ass'n of Rural Residents v. Kitsap County, No. 93-3-0010, 1994 WL 907885 at *27 (Cent. Puget Sound Growth Mgmt. Hr'gs Bd. June 3, 1994) (Final Decision and Order)); see also WAC 365-

4

196-310(4)(b)(ii)(A). "Net acreage is calculated by reducing the total gross acres located within a specific area by the number of acres that are, for whatever reasons, not likely to be made available for urban development during the twenty-year planning cycle." Lloyd, supra, at 113; see also WAC 365-196-410(b)(ii)(B)-(C), (F). The resulting net acreage is then multiplied by "assumed density" (or the "density multiplier"), i.e., "[t]he density at which future development is expected to occur," to determine how much of the 20-year forecasted growth can be accommodated within the UGA. See Lloyd, supra, at 115-16; RCW 36.70A.110(2); WAC 365-196-300(2)(b).

The LCA "should evaluate what the development regulations allow, rather than what development has actually occurred." WAC 365-196-325(2)(c). To that end, the LCA is distinct from a buildable lands report (BLR), which is another type of analysis required of certain counties under the GMA. Specifically, some counties, including the County, are required to maintain a "buildable lands program" under RCW 36.70A.215. RCW 36.70A.215(1); WAC 365-196-315(2)(a). The purpose of that program is twofold, i.e., to:

> (a) Determine whether a county and its cities are achieving urban densities within [UGAs] by comparing growth and development assumptions, targets, and objectives . . . with actual growth and development that has occurred in the county and its cities; and
>
> (b) Identify reasonable measures, other than adjusting [UGAs], that will be taken to comply with the requirements of [the GMA].

Former RCW 36.70A.215(1) (2011). The buildable lands program culminates in a BLR that must be submitted to the Washington State Department of Commerce upon publication. Former WAC 365-196-315(4)(a) (2010). The Board has

described the distinction between an LCA and a BLR as follows:

> The LCA is a critical mechanism for the sizing of a UGA because it is utilized to determine how much urban land is needed. Therefore, in contrast to the [BLR], the LCA is prospective - looking forward over the coming 20 years to see if there is enough land within the UGA to accommodate the growth that has been allocated to the area. . . .
>
> . . . The primary purpose of the BLR is to review whether a county and its cities are achieving urban densities within the UGAs . . . . The BLR is retrospective - looking back over the past five years of development to see how well the county and its cities have performed.

Friends of Skagit County v. Skagit County, No. 07-2-0025c, 2008 WL 2783670 at *9 (W. Wash. Growth Mgmt. Hr'gs Bd. June 18, 2008) (Order on Motions for Reconsideration). "The information developed through the BLR provides important information for updating and, perhaps, revising a County's [LCA]." Friends of Skagit County, 2008 WL 2783670 at *9. Thus, in preparing an LCA to estimate future capacity, counties should consider information from associated BLRs. WAC 365-196-310(4)(b)(ii)(E).

The County's 2016 Plan Update

The County adopted its first comprehensive plan in 1998 and completed a subsequent update in 2006. See Suquamish Tribe v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd. (Suquamish I), 156 Wn. App. 743, 748-49, 235 P.3d 812 (2010). Ten years later, in June 2016, the County adopted Ordinance 534-2016 to again update its comprehensive plan and development regulations under the GMA's continuing review requirements. The ordinance made several procedural and substantive findings related to the update and then adopted and incorporated by reference the following documents: (1) The Kitsap County Comprehensive Plan

2016-2036; (2) The Capital Facilities Plan for Kitsap County Comprehensive Plan 2016 Update; (3) The Kitsap County Comprehensive Plan and Zoning Maps; (4) amendments to Kitsap County Code 13.12.015, "Waivers"; and (5) amendments to the County's zoning code. The LCA on which the comprehensive plan updates were based was *not* expressly adopted as part of the ordinance.

Harless petitioned to the Board for review of the ordinance. He raised two issues in his petition, only one of which is at issue in this appeal. Harless framed that issue as follows:

> Has Kitsap County failed to be guided by RCW 36.70A.020(1) and (2) and failed to comply with the consistency requirements of RCW 36.70A.040 and RCW 36.70A.070 and the requirements of RCW 36.70A.110, RCW 36.70A.115 and RCW 36.70A.130 to adopt an internally consistent plan, development regulations that are consistent with and implement that plan and designate [UGAs] appropriately sized to accommodate growth in that the [LCA] calculates land capacity by applying permitted density to net developable land area while the zoning regulations calculate permitted density on gross land area, resulting in excessively oversized UGAs?

In his prehearing brief to the Board, Harless observed that the County's LCA "follows what has now become the standard county LCA formula." Specifically, Harless explained that "[b]eginning with gross land area within the UGA, the analysis identifies and quantifies vacant and underutilized lands to find a subtotal of 'total redevelopable acres' which is the equivalent of the gross land area of available, i.e.[,] undeveloped, lands." Harless went on to explain that "[f]rom this subtotal, the [LCA] formula deducts sequentially for mapped environmentally critical areas, future road rights-of-way, future public facilities and finally for 'unavailable lands'." Harless asserted in his brief that for most

7

UGAs within the County, "the resulting 'net developable acres' typically amounts to half or less of the 'total redevelopable acres' although this varies somewhat from one UGA to the next."

Harless also explained that once net developable acres are calculated, "[t]he LCA formula then calculates dwelling unit capacity by applying a density figure based on the permitted density range for the zoning designation." "For example, the Urban Low Residential zone which comprises the majority of urban residential lands, has a permitted density range of 5-9 du/acre. The LCA applies a density [multiplier] of 6 du/ac." According to Harless, this density multiplier was "derived from the net density of new subdivisions (plats). So capacity is determined by applying an observed net platted density to net developable acres."

Harless then pointed out that under the County's zoning code, the allowed densities for residential zones are expressed in terms of a range, i.e., that in a particular residential zone, there is both a minimum density requirement and a maximum density ceiling. He also observed that while the minimum density in a zone is expressed in dwelling units per *net* developable acre, the maximum density is calculated based on *gross* acreage of the property. This, the County later explained, encourages density by allowing up to the maximum number of dwelling units to be built on a parcel even if part of that parcel is undevelopable. Harless argued that this inconsistency between the LCA, which calculated the UGA's holding capacity based on observed platted densities and net developable acres, and the zoning code, whose maximum densities are based on gross

8

acreage, violated the consistency requirements of the GMA and resulted in oversized UGAs.

The Board dismissed Harless's challenge after a hearing. In its order, the Board explained:

> [T]his Board considers issues relating to whether or not an **adopted** comprehensive plan, development regulation or permanent amendment thereto is in compliance with the goals and requirements of the GMA.
> This Board's jurisdiction is statutory in origin and limited in scope. In evaluating issues, the Board looks for identification of the specific language in the Ordinance that is alleged to be non-compliant, together with identification of the specific GMA sections alleged to be violated. Here, Harless needed to show a problem within the four corners of Ordinance 534-2016 and connect that problem to specific provision [sic] of the GMA.
> Harless has significant concerns about the density calculations and methodology used in preparing the LCA for the Central Kitsap UGA. Ordinance 534-2016 relied on the LCA but there is no showing that the LCA was **adopted** as part of the County Commissioners' action in adopting the Ordinance. So Harless cannot challenge the LCA in the present case because the LCA was not part of the challenged Ordinance 534-2016.
> While the LCA can be assessed for its sufficiency in supporting the UGA . . . , it does not follow that the LCA, absent adoption, can be considered to be a part of the Ordinance so as to consider an assertion of inconsistency with a single development regulation.
> **The Board finds and concludes that Harless** has not satisfied his burden to prove that specific language in the adopted Ordinance was clearly erroneous, in violation of the GMA provisions cited in his issue statement. Issue 2 is dismissed.

(Footnote omitted.)

Harless moved for reconsideration, arguing that the Board erred by concluding that it lacked subject matter jurisdiction to decide his challenge on the basis that the LCA was not expressly adopted as part of the ordinance. He also argued that because the comprehensive plan expressly based the size and

9

extent of the UGA on the LCA, the LCA *was* part of the plan adopted by the ordinance.

The Board denied reconsideration. It addressed Harless's jurisdictional argument and clarified its earlier order as follows:

> Subject matter jurisdiction is neither analyzed nor relied upon for the Board's findings and conclusion; Harless is arguing for reconsideration based on a finding and conclusion that the Board did not make. The Board has subject matter jurisdiction. The [Board's order] concluded that Harless failed to satisfy his burden of proof to show an **inconsistency** between the **challenged ordinance** and the **previously adopted development regulation.**

Harless appealed to Thurston County Superior Court, which affirmed the Board. Harless appeals.

## DISCUSSION

### Standard of Review

Judicial review of a board decision is governed by the Administrative Procedure Act, chapter 34.05 RCW. Thurston County, 164 Wn.2d at 341. "On appeal, we review the Board's decision, not the superior court decision affirming it." Lewis County v. W. Wash. Growth Mgmt. Hr'gs Bd., 157 Wn.2d 488, 497, 139 P.3d 1096 (2006). "The party appealing a board's decision has the burden of demonstrating the invalidity of the board's actions." Thurston County, 164 Wn.2d at 341; RCW 34.05.570(1)(a). In reviewing a board decision, we review issues of law de novo. Thurston County, 164 Wn.2d at 341. While not being bound by them, we give substantial weight to the Board's interpretations of the GMA. Thurston County, 164 Wn.2d at 341.

As to issues of fact, "[a] board's order must be supported by substantial

10

evidence, meaning there is 'a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order.'" Thurston County, 164 Wn.2d at 341 (internal quotation marks omitted) (quoting City of Redmond v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd., 136 Wn.2d 38, 46, 959 P.2d 1091 (1998)). And as to mixed questions of law and fact, we determine the law independently, then apply it to the facts as found by the agency. Thurston County, 164 Wn.2d at 341. A court may grant relief from an agency order on nine statutorily enumerated bases. RCW 34.05.570(3). As relevant here, a court "shall grant relief from an agency order" if it determines that (1) "[t]he agency has erroneously interpreted or applied the law," (2) the order is not supported by substantial evidence "when viewed in light of the whole record before the court," or (3) "[t]he agency has not decided all issues requiring resolution by the agency." RCW 34.05.570(3)(d)-(f).

## Analysis

Harless argues that the Board erred by basing its dismissal of his challenge on the fact that the LCA was not adopted as part of the ordinance. We disagree inasmuch as the Board dismissed Harless's challenge of inconsistency under RCW 36.70A.040. But that statute was not the only basis for Harless's challenge, and the Board did not address the other bases for Harless's challenge. Therefore, and as further discussed below, remand is required for the Board to address those additional bases or explain why it dismissed Harless's challenge under the other GMA provisions cited in Harless's issue statement.

The Board "adjudicate[s] issues of GMA compliance and may invalidate

11

noncompliant comprehensive plans." Thurston County, 164 Wn.2d at 340; RCW 36.70A.280(1)(a), .302. "A comprehensive plan is presumed valid, and '[t]he board shall find compliance unless it determines that the action by the state agency, county, or city is clearly erroneous in view of the entire record before the board and in light of the goals and requirements of [the GMA].'" Thurston County, 164 Wn.2d at 340 (alterations in original) (quoting RCW 36.70A.320(3)). "To find an action 'clearly erroneous,' the Board must have a 'firm and definite conviction that a mistake has been committed.'" Lewis County, 157 Wn.2d at 497 (quoting Dep't of Ecology v. Pub. Util. Dist. No. 1 of Jefferson County, 121 Wn.2d 179, 201, 849 P.2d 646 (1993), aff'd, 511 U.S. 700, 114 S. Ct 1900, 128 L. Ed. 2d 716 (1994)). "The party petitioning for review of a comprehensive plan has the burden of demonstrating the local government's actions failed to comply with the GMA." Thurston County, 164 Wn.2d at 341; RCW 36.70A.320(2). "A board must defer to a local government's decisions that are consistent with the GMA." Thurston County, 164 Wn.2d at 341; RCW 36.70A.3201.

Here, Harless challenged the County's 2016 comprehensive plan update on the basis that, among other things, it failed to comply with the consistency requirement of RCW 36.70A.040. Under that statute, a newly adopted or amended development regulation must be "consistent with and implement the comprehensive plan." RCW 36.70A.040(3)(d), (4)(d), (5)(d). The Board concluded in this regard that Harless "needed to show a problem within the four corners of Ordinance 534-2016 and connect that problem to [a] specific provision of the GMA." It then wrote that although the ordinance relied on the LCA, "there

12

is no showing that the LCA was **adopted** as part of the County Commissioners' action in adopting the Ordinance." The Board later clarified in its order denying Harless's motion for reconsideration that Harless had "failed to satisfy his burden of proof to show an *inconsistency* between the *challenged ordinance* and the *previously adopted development regulation*."

This was not error. Specifically, RCW 36.70A.040's consistency requirement calls for a comparison between a development regulation and a comprehensive plan. But Harless's arguments to the Board focused on alleged inconsistencies between a development regulation, i.e., the County's zoning code, and the *LCA*. And although the LCA undisputedly was used in the *development* of the comprehensive plan, it was not adopted as a *part* of the plan. Harless points to no authority supporting the proposition that absent adoption as part of the plan, the LCA can serve as the basis for a consistency challenge under RCW 36.70A.040. Therefore, the Board did not err in dismissing Harless's consistency challenge with regard to RCW 36.70A.040.

Harless disagrees and contends that the LCA *was* a part of the plan. He points out that the LCA's "detailed area, density and capacity calculations were included in the Final Supplemental Environmental Impact Statement (FSEIS) which is undeniably a part of the record of the County's UGA decision-making and was before the Board." (Footnote omitted.) He also points out that the County filed the FSEIS as a "core document" before the Board and pointed out to the Board that the LCA was found within the FSEIS. And, he observes, the LCA formed the basis for the UGA designation in the comprehensive plan and the

13

County acknowledged as much in its argument to the Board. But Harless's contentions establish, at most, that the LCA was an integral tool used to develop the plan—not that it was a *part* of the adopted plan such that the LCA can serve as a basis for an inconsistency challenge under RCW 36.70A.040. Therefore, Harless's argument fails.

That said, Harless did not just raise a consistency challenge under RCW 36.70A.040. Rather, Harless's issue statement to the Board plainly alleges more than just a violation of RCW 36.70A.040. Specifically, it is readily apparent from Harless's issue statement and his briefing to the Board that Harless alleged that the LCA did not properly account for the densities allowed under the County's zoning code, resulting in an excessively oversized UGA and violating certain GMA provisions, each of which is discussed in turn below.

*Violation of RCW 36.70A.070*

Harless alleged that the County failed to comply not only with the consistency requirements of RCW 36.70A.040, but also with the consistency requirements of RCW 36.70A.070. That statute provides, in relevant part, that the comprehensive plan "shall be an internally consistent document." RCW 36.70A.070. This means that "differing parts of the comprehensive plan must fit together so that no one feature precludes the achievement of any other." WAC 365-196-500(1). Notably, in a challenge to the County's 2006 plan update that Harless also participated in, the Board concluded that the County failed to comply with RCW 36.70A.070's consistency requirement in part because it expanded the UGA based on an erroneous methodology employed in its LCA.

14

Suquamish Tribe v. Kitsap County (Suquamish II), No. 07-3-0019c, 2011 WL 9495569 at *29, *36 (Cent. Puget Sound Growth Mgmt. Hr'gs Bd. Aug. 31, 2011) (Final Decision and Order on Remand).

Specifically, in its 2006 plan update, the County designated a minimum density of four du/ac for 90 percent of its urban areas. Suquamish I, 156 Wn. App. at 751-52. It also assumed that development would occur at this minimum density for purposes of the LCA—and thus for purposes of sizing the UGA. Suquamish I, 156 Wn. App. at 750 n.4, 751-52. The effect of the 2006 plan update was to expand the UGA by 12.7 square miles, thereby reducing the County's rural areas to accommodate the growth projected using the minimum density. Suquamish I, 156 Wn. App. at 750 n.5. Harless and others challenged the updated plan before the Board. Suquamish I, 156 Wn. App. at 751. They argued, among other things, that the County's LCA failed to comply "with the GMA's (1) urban growth and antisprawl goals, (2) requirements for UGA designation, and (3) requirement for internal consistency." Suquamish I, 156 Wn. App. at 751.

In its review, the Board approved four du/ac as an "appropriate" density, observing that since 1995, four du/ac "has been an approved and accepted minimum urban density for Kitsap County." Suquamish I, 156 Wn. App. at 752. On appeal, Division Two concluded that the Board erred by applying a bright-line rule that four du/ac was an appropriate urban density for the County. Suquamish I, 156 Wn. App. at 762. Accordingly, Division Two remanded to the Board to consider whether local circumstances supported a minimum urban density of four

15

du/ac and, if so, "whether the County creates inconsistencies with the GMA's goals, the [BLR], and the plan when it uses such a minimum density in the [LCA]." Suquamish I, 156 Wn. App. at 781. The Board concluded on remand that using the minimum density as the density multiplier "is not supported by local circumstances, . . . as it ignores the *range* of densities allowed in each designation and the *trend* to higher achieved densities in the [zone]." Suquamish II, 2011 WL 9495569 at *33.

Here, Harless argued to the Board that the County's LCA methodology, which he alleged "calculates capacity by applying net density trends (within permitted density ranges) to net developable acres," underestimated the UGA's available capacity by a factor of more than two. He also alleged that this resulted in an excessively oversized UGA. In other words, similar to the challengers to the County's 2006 plan update, Harless also bases his RCW 36.70A.070 internal consistency argument on the methodology that the County used in its LCA and the resulting sizing of the UGA. Indeed, even the Board acknowledged that "Harless has significant concerns about the density calculations and methodology used in preparing the LCA for Central Kitsap UGA."

But the Board did not address these concerns in its order or articulate why dismissal was appropriate without reaching them. Rather, the Board confirmed on reconsideration that its order "concluded that Harless failed to satisfy his burden of proof to show an *inconsistency* between the *challenged ordinance* and the *previously adopted development regulation*." This language reveals that the Board's focus was on RCW 36.70A.040, which, as discussed, calls for a

comparison between the plan and an allegedly inconsistent development regulation. Because the Board did not address Harless's challenge under the consistency requirement of RCW 36.70A.070, remand is required. See RCW 34.05.570(3)(f) ("The court shall grant relief from an agency order . . . if it determines that . . . [t]he agency has not decided all issues requiring resolution by the agency."); see also Suquamish I, 156 Wn. App. at 776 (explaining that remand is required under RCW 34.05.570(3)(f) where an agency fails to decide an issue within its purview); Low Income Hous. Inst. v. City of Lakewood, 119 Wn. App. 110, 119, 77 P.3d 653 (2003) (remanding to the Board for more thorough findings and articulation for the basis of its ruling where court was unable to review Board's analysis on an issue under the summary order entered by the Board).

The County contends that Harless abandoned his RCW 36.70A.070 consistency arguments on appeal. But Harless refers to RCW 36.70A.070 in a section of his opening brief, arguing that various elements of the comprehensive plan are based on the UGA growth figures and therefore will be "woefully inadequate" in light of the UGA's allegedly erroneous sizing. Thus, we decline to consider this argument abandoned.

*Violation of RCW 36.70A.020(1) and (2)*

Harless alleged that in updating its plan, the County failed to be guided by RCW 36.70A.020(1) and (2). These two statutes set forth the GMA's urban growth and antisprawl goals:

> (1) Urban growth. Encourage development in urban areas
> where adequate public facilities and services exist or can be

provided in an efficient manner.

    (2) Reduce sprawl. Reduce the inappropriate conversion of undeveloped land into sprawling, low-density development.

RCW 36.70A.020(1)-(2). The Board is required to consider both goals and specific requirements in determining whether a plan complies with the GMA. RCW 36.70A.320(3) ("The board shall find compliance unless it determines that the action by the . . . county . . . is clearly erroneous in view of the entire record before the board *and in light of the goals and requirements* of [the GMA].") (emphasis added). To this end, in Suquamish II, the Board concluded that the County failed to comply with the GMA's urban growth and antisprawl goals when its erroneous LCA methodology resulted in a UGA expansion. Suquamish II, 2011 WL 9495569 at *36. Specifically, the Board found that the County's use of the minimum allowed density as the density multiplier, notwithstanding zoned ranges and achieved densities, "creates a UGA that is too large" and therefore inconsistent with the GMA's urban growth and antisprawl goals. Suquamish II, 2011 WL 9495569 at *34.

Similarly, here, Harless argued to the Board that the "impact of calculating land capacity based on net developable acres, but permitting density calculated on gross acres is that the actual permitted capacity of the UGA is nearly triple that calculated in the LCA." Harless argued further that "such an excessively oversized UGA fails to comply with the requirements of the GMA and substantially interferes with the urban growth and anti-sprawl goals of the GMA (RCW 36.70A.020(1) and (2))."

Nevertheless, and despite the Board's acknowledgment that "the LCA can

18

be assessed for its sufficiency in supporting the UGA," the Board's order does not address Harless's argument. Indeed, although Harless's issue statement clearly references RCW 36.70A.020(1) and (2), as does the Board's prehearing order in which it listed the issues it would consider, the Board mysteriously omitted any reference to these statutes when it restated the issue in its order.[1] Therefore, remand is required for the Board to consider Harless's argument or articulate its reasons for rejecting it.

*Violation of RCW 36.70A.110, .115, and .130*

Finally, Harless argued to the Board that the County failed to comply with the requirements of RCW 36.70A.110, .115, and .130. Harless's challenge based on these statutes relied primarily on our Supreme Court's holding in Thurston County, i.e., that "a county's UGA designation cannot exceed the amount of land necessary to accommodate the urban growth projected by OFM, plus a reasonable land market supply factor." Thurston County, 164 Wn.2d at 352. Specifically, Harless argued that "[b]y authorizing nearly triple the urban housing capacity set forth in the comprehensive plan, the inconsistent zoning code has created excessively oversized UGAs in violation of RCW 36.70A.110, 115 and 130, a situation in which the Supreme Court in Thurston County determined that 'sprawl could abound.'" But the Board either did not consider this argument or failed to articulate its reasons for rejecting it. Therefore, as

---

[1] Compare Administrative Record (AR) at 1651 ("Has Kitsap County failed [to] comply with the consistency requirements of . . . .") with AR at 34 ("Has Kitsap County failed *to be guided by RCW 36.70A.020(1) and (2) and* failed to comply with the consistency requirements of . . . .") (Emphasis added.).

19

discussed, remand is required.

To this end, the bulk of the parties' briefing—both with regard to this final argument and with regard to Harless's other arguments—focuses on the parties' dispute as to whether the fact that LCA capacity is based on net acreage, while the zoning code's maximum density is expressed in terms of gross acreage, results in an oversized UGA. On the one hand, Harless contends that the LCA methodology is improperly based on historical density trends without sufficiently accounting for densities allowed under the zoning code. In other words, Harless contends that the County's plan violates the GMA in that it is not aspirational enough. As he argued to the Board:

> What the County has done is only look backward and say we've seen 6.1 units per acre as a trend, so we're still going to assume six units per acre of what's going to happen in the future.
> The Growth Management Act is about change, otherwise, there would have been no need to enact it in the first place. The County must assume that things are going to change as a result of its Plan and look at what might happen in the future, which means they have to look at permitted density, what they're allowing, as well as what's happened in the past.

In support of his argument, Harless pointed to evidence in the record that the LCA density multiplier was based on achieved, i.e., backward-looking, densities from the BLR. He also asserted that the LCA's density multiplier applied observed platted densities to *net* acreage.

Meanwhile, the County contends that contrary to Harless's assertion, it calculated assumed densities "based on a variety of factors and local circumstances." It also asserts that Harless's argument that the UGA has more capacity than reflected in the LCA is not supported by the record and that using

20

gross acreage to calculate maximum allowed densities in the zoning code does not result in oversized UGAs. The County also disagrees with Harless's characterization of the extent to which allowed densities are required to be considered as part of the LCA.

These disputes are ones that the Board, and not this court, should resolve in the first instance. See Low Income Hous. Inst., 119 Wn. App. at 116 n.3 (declining to decide whether the Lakewood comprehensive plan furthered the GMA's affordable housing goals "[b]ecause the Board, not this court, is the proper entity to resolve this dispute"). But the Board neither addressed these disputes nor explained why dismissal was proper without reaching them. Therefore, as discussed, remand is required.

As a final matter, the County argues that the Board *did* adequately address all aspects of Harless's challenge and points to the following language in the Board's order: "**The Board finds and concludes that Harless** has not satisfied his burden to prove that specific language in the adopted Ordinance was clearly erroneous, in violation of the GMA provisions cited in his issue statement." But the County's argument is unpersuasive for two reasons. First, the summary nature of the Board's finding and conclusion that Harless did not meet his burden precludes meaningful review. For example, perhaps the Board reached its conclusion because it was unpersuaded by Harless's contention that allowing densities based on gross acreage increases UGA capacity. Or perhaps the Board *was* persuaded but still concluded that the plan was GMA-compliant under the Board's interpretation of the GMA. In short, even if the Board *did*

consider Harless's arguments under GMA provisions other than RCW 36.70A.040, remand is required for the Board to articulate its basis for rejecting those arguments. Cf. Low Income Hous. Inst., 119 Wn. App. at 119 (remanding to the Board "for more thorough findings and articulation of the basis for [its] ruling" where the court could not review the Board's analysis under the summary order presented).

Second, contrary to the Board's characterization in its summary finding and conclusion, Harless's challenge was not predicated on whether the "specific language in the adopted Ordinance" was clearly erroneous. Rather, Harless's petition and brief to the Board make clear that Harless was challenging the County's *action in adopting* the 2016 plan. This challenge was squarely within the Board's purview under RCW 36.70A.320(3), which provides that the Board must find compliance "unless it determines that *the action by the . . . county . . .* is clearly erroneous in view of the entire record before the [B]oard and in light of the goals and requirements of [the GMA]." (Emphasis added.) Indeed, to the extent that the Board confined its review to the "specific language in the adopted Ordinance" as opposed to the County's action in adopting the ordinance, the Board committed legal error, making remand all the more appropriate. See Suquamish I, 156 Wn. App. at 778 ("When an agency fails to address an issue or supplies no reason for a decision, based on an erroneous legal conclusion that leads an agency either to not decide or to inadequately decide an issue, a legal ground for remand . . . and further proceedings before the agency arises.").

We affirm the Board's dismissal of Harless's challenge to the extent that

he alleged a violation of RCW 36.70A.040's consistency requirement. We remand to the Board to address Harless's arguments under the remaining GMA provisions specified in his issue statement or to more thoroughly articulate its basis for dismissing those arguments.

_____

WE CONCUR:

_____

_____