**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

PUGET SOUNDKEEPER ALLIANCE,

      Appellant,

      v.

STATE OF WASHINGTON
POLLUTION CONTROL HEARINGS
BOARD,

      Respondent,

and

STATE OF WASHINGTON,
DEPARTMENT OF ECOLOGY,

      Respondent below,

and

BNSF RAILWAY COMPANY, THE
NORTHWEST SEAPORT ALLIANCE,
PORT OF SEATTLE, PORT OF
TACOMA, PACIFIC MERCHANT
SHIPPING ASSOCIATION, and SSA
TERMINALS, LLC,

      Respondents.

No. 85665-1-I

DIVISION ONE

PUBLISHED OPINION

MANN, J. — "Stormwater runoff is one of the most significant sources of water pollution in the nation, at times 'comparable to, if not greater than, contamination from industrial and sewage sources."[1]  The Washington Department of Ecology is charged by

---

[1] Env't Def. Ctr., Inc. v. U.S. Env't Prot. Agency, 344 F.3d 832, 840-41 (9th Cir. 2003).

statute with implementing both the federal Clean Water Act of 1977 (CWA), 33 U.S.C. §§ 1251-1389, and Washington's "Water Pollution Control Act" (WPCA), ch. 90.48 RCW.  This appeal concerns Ecology's issuance of the 2020 Industrial Stormwater General Permit (2020 permit) under the National Pollutant Discharge Elimination System (NPDES) and state discharge permit program.  Consistent with prior iterations of the same permit, Ecology maintains that under the 2020 permit "transportation facilities" that have "vehicle maintenance shops, equipment cleaning operations, or airport deicing operations" must obtain coverage under the 2020 permit.  And for facilities that must obtain coverage, the permit requirements apply to the entire facility— not limited portions.

Several parties appealed the 2020 permit raising a multitude of issues.  The Pollution Control Hearings Board (PCHB) granted summary judgment on legal issue 11 in favor of industry appellants and declared legal issue 12 moot as a result.  The PCHB concluded, as a matter of law, that the 2020 permit was unambiguous and only applied to limited portions of the covered transportation facilities.  Puget Soundkeeper Alliance (PSA) appeals the PCHB's order granting summary judgment and argues that the permit applies to the entire transportation facility. [2]  We agree.

We reverse and set aside the PCHB's order on legal issues 11 and 12.  We remand to the PCHB to, consistent with this opinion, grant summary judgment on legal issue 11 in favor of Ecology and PSA, and reach the merits of legal issue 12.

---

[2] Ecology was the respondent before the PCHB below and submitted a brief as a respondent in this appeal in favor of reversing the PCHB's order.

I

A

The objective of the federal CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA set a national goal to eliminate the discharge of pollutants into the Nation's waters by 1985. 33 U.S.C. § 1251(a)(1). The CWA also recognized the role of the states in controlling water pollution: "the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution." 33 U.S.C. § 1251(b). Consistent with this policy, the CWA explicitly authorizes states to regulate water pollution more stringently than required by the CWA. 33 U.S.C. § 1370.

The CWA prohibits the discharge of any pollutant from a point source to navigable waters without a permit. 33 U.S.C. §§ 1311(a), 1362(12). The NPDES program is the permitting program through which individuals, corporations, and governments obtain the required permits before discharging pollution from any point source into the navigable waters of the United States. 33 U.S.C. § 1342; Decker v. Nw. Env't Def. Ctr., 568 U.S. 597, 602, 133 S. Ct. 1326, 185 L. Ed. 2d 447 (2013). The Environmental Protection Agency (EPA) sets the base requirements for the NPDES program and is authorized to delegate administration of the program to a state upon a state's request and submission that it has adequate authority to carry out the program. 33 U.S.C. § 1342(b). The CWA makes clear that EPA's mandates and standards are a floor, not a ceiling:

> Except as expressly provided in this chapter, nothing in this chapter shall . . . preclude or deny the right of any State . . . to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution; except that if an effluent limitation, or other limitation, effluent standard, prohibition, . . . or standard of performance is in effect under this chapter, such State . . . may not adopt or enforce any effluent limitation or other limitation, effluent standard, prohibition, . . . or standard of performance which is less stringent than the effluent limitation, or other limitation, effluent standard, prohibition, . . . or standard of performance under this chapter.

33 U.S.C. § 1370; see also 33 U.S.C. § 1251(b) ("It is the policy of the Congress to recognize, preserve, and protect the primary responsibility and rights of States to prevent, reduce, and eliminate pollution.").

EPA authorized Ecology to administer the NPDES program in Washington in 1974. See Discharge of Pollutants to Navigable Waters, 39 Fed. Reg. 26,061 (July 16, 1974). The Washington Legislature has designated Ecology as the state water pollution control agency for all purposes under the CWA. RCW 90.48.260.

Ecology also administers the WPCA. The WPCA declares it is the public policy of the state to:

> maintain the highest possible standards to insure the purity of all waters of the state consistent with public health and public enjoyment thereof, the propagation and protection of wild life, birds, game, fish, and other aquatic life, and the industrial development of the state, and to that end require the use of all known available and reasonable methods by industries and others to prevent and control the pollution of the waters of the state.

RCW 90.48.010. The legislature also declared a public policy of "working cooperatively with the federal government in a joint effort to extinguish the sources of water quality degradation, while at the same time preserving and vigorously exercising state powers" to protect water quality. RCW 90.48.010.

RCW 90.48.020 broadly defines "pollution" to include any contamination of state waters that "will or is likely to create a nuisance or render such waters harmful . . . to the public health, safety or welfare, or to domestic, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, fish, or other aquatic life." RCW 90.48.080 prohibits all discharges of any "matter that shall cause or tend to cause pollution. Under RCW 90.48.160, a discharge permit is required by "[a]ny person who conducts a commercial or industrial operation of any type which results in the disposal of solid or liquid waste material" into any water of the state."

B

There are generally two types of NPDES permits: individual and general. See Nat. Res. Def. Council v. U.S. Env't Prot. Agency, 279 F.3d 1180, 1183 (9th Cir. 2002). Individual NPDES permits authorize a specific entity to discharge pollutants at a specific location or locations. WAC 173-220-030(12). Individual NPDES permits are issued after an informal agency adjudication process. See 40 C.F.R. § 122.21. In contrast, general NPDES permits are issued for an entire class of potential dischargers in a given geographical location. General permits may be appropriate when the dischargers in a geographic area are relatively homogenous—such as stormwater dischargers. 40 C.F.R. § 122.28; WAC 173-226-030(13). General permits are issued pursuant to an administrative rulemaking process, including public notice, public hearing, and an administrative appeal process. WAC 173-226-130 to -180. Once a general permit is issued, it is up to the facility to apply for coverage under the general permit. WAC 173-226-200.

General NPDES permits, like the 2020 permit at issue, are designed to satisfy the requirements of both the federal CWA and the state WPCA. WAC 173-226-010.

C

Stormwater pollution is a major concern for the states. As recognized by the Ninth Circuit over twenty years ago, "[s]tormwater runoff is one of the most significant sources of water pollution in the nation, at times 'comparable to, if not greater than, contamination from industrial and sewage sources.'" Env't Def. Ctr., Inc. v. U.S. Env't Prot. Agency, 344 F.3d 832, 840-41 (9th Cir. 2003). As acknowledged by the PCHB:

> Stormwater is the leading contributor to water quality pollution in urban waterways. Common pollutants in stormwater include lead, zinc, cadmium, copper, chromium, arsenic, bacterial/viral agents, oil & grease, organic toxins, sediments, nutrients, heat, and oxygen-demanding organics. Municipal stormwater also causes hydrologic impacts, because the quantity and peak flows of runoff are increased by the large impervious surfaces in urban areas. Stormwater discharges degrade water bodies and, consequently, impact human health, salmon habitat, drinking water, and the shellfish industry.

Puget Soundkeeper All. v. Dep't of Ecology, No. 07-21, at 11-12 (Wash. Pollution Control Hr'gs Bd. Apr. 2, 2008) [https://perma.cc/W66H-DTBL].

EPA initially exempted stormwater discharges from the CWA's requirements. Defs. of Wildlife v. Browner, 191 F.3d 1159, 1163, amended and reh'g denied, 197 F.3d 1035 (9th Cir. 1999); see former 40 C.F.R. § 125.4 (1973). The Court of Appeals for the District of Columbia, however, invalidated this exemption. Nat. Res. Def. Council, Inc. v. Costle, 186 U.S. App. D.C. 147, 568 F.2d 1369, 1377 (D.C. Cir. 1977). Subsequently, EPA issued regulations governing stormwater discharges and those rules were challenged at the administrative level and in the courts. Defs. of Wildlife, 191 F.3d at 1163. In 1987, Congress passed the Water Quality Act, amending the CWA so

that stormwater discharges associated with industrial activity are not exempt from permit requirements.  33 U.S.C. § 1342(p)(2); Water Quality Act of 1987, Pub. L. No. 100-4, 101 Stat. 7.

EPA's regulations broadly define "storm water discharge associated with industrial activity" to include discharges from a wide variety of pollution generating areas and activities, including, but not limited to:

> [I]mmediate access roads and rail lines used or traveled by carriers of raw materials, manufactured products, waste material, or by-products used or created by the facility; material handling sites; . . . shipping and receiving areas; . . . storage areas (including tank farms) for raw materials, and intermediate and final products; . . . storage, loading and unloading, transportation, or conveyance of any raw material, intermediate product, final product, by-product or waste product.

40 C.F.R. § 122.26(b)(14).

EPA's regulation then identifies the "categories of facilities . . . considered to be engaging in 'industrial activity' for the purposes of paragraph (b)(14)."  These are the categories of facilities, identified by Standard Industrial Classifications (SIC) that are required to obtain a NPDES permit to authorize stormwater discharges.  Transportation facilities are identified in 40 C.F.R. § 122.26(b)(14)(viii) (or "category 8"), and are required to obtain a NPDES permit if they have "vehicle maintenance shops, equipment cleaning operations, or airport deicing operations."

EPA's regulation continues, however, and limits the requirement for NPDES permits to specific portions of the transportation facility:

> Only those portions of the facility that are either involved in vehicle maintenance (including vehicle rehabilitation, mechanical repairs, painting, fueling, and lubrication), equipment cleaning operations, airport deicing operations . . . are associated with industrial activity.

-7-

40 C.F.R. § 122.26(b)(14)(viii).[3]

D

Ecology regulates certain stormwater discharges from industrial activities under a general NPDES permit under WAC 173-226.  The statewide industrial stormwater general permit is meant to comply with both the WPCA and the CWA.  WAC 173-226-010.

In preparation for issuing the 2010 version of the industrial stormwater general permit (2010 permit), Ecology's permit team recognized that there was a question over coverage at category 8 transportation facilities: whether the 2010 permit would apply to the entire site, or be limited to just the vehicle maintenance areas consistent with the federal regulation's limiting language.  This issue was discussed with Ecology's permit management team who decided that such coverage was a matter of site-specific implementation.  In other words, once permit coverage is required at a transportation facility, the permit applies to all discharges from industrial activity which may vary from site to site as opposed to regulating "only those portions" of the facility like the limiting language in 40 C.F.R. § 122.26(b)(14)(viii).

---

[3] In its brief, Ecology offers one example of the effect of the limiting language in 40 C.F.R. § 122.26(b)(14)(viii):

> For example, at the Port of Tacoma's West Sitcum Terminal, 'five enormous ship-to-shore cranes load and unload large shipping containers from docked vessels.'  If these loading and unloading activities took place at any facility other than a transportation facility they would clearly be associated with industrial activity under 40 C.F.R. § 122.26(b)(14) because loading and unloading areas are included in the definition of stormwater discharge associated with industrial activity.  However, when these same activities take place at a transportation facility, they are not associated with industrial activity under EPA's regulations.

In response to Ecology's draft 2010 permit, commenters, including appellant BNSF Railway Company, asked that Ecology include in the body of the permit the "only those portions" limiting language. Ecology responded that it had decided not to include the limiting language. Similarly, in Ecology's 2010 "Frequently Asked Questions" document it explained that once a transportation facility required a permit, the permit applied to the entire facility:

> Q11: My transportation facility has a vehicle maintenance shop and therefore requires permit coverage. Does the permit apply to the entire footprint of the facility, or just to the area where we conduct vehicle maintenance activity?
> A11: Once a transportation facility has permit coverage, the permit conditions for sampling, inspection and stormwater management practices are required in all areas of industrial activity—rather than only those areas where vehicle maintenance, equipment cleaning and airport de-icing occur.

On July 27, 2010, Washington Ports (including the Ports of Vancouver, Longview, and Olympia) wrote to Ecology's director raising concerns with Ecology's implementation and enforcement of the 2010 permit. The Ports raised their concern that Ecology's permit manager told the Ports that "a vehicle maintenance facility triggers Industrial Permit coverage and monitoring of <u>all</u> port property (as opposed to coverage and monitoring of the discrete maintenance facility)." Ecology responded and confirmed that "[o]nce a facility has permit coverage, the Permit's sampling, inspection, and stormwater management practices are required in all areas of industrial activity—rather than only those areas where vehicle maintenance, equipment cleaning, and airport deicing occur." Ecology recommended that "Ports take the necessary steps to implement the Permit requirement on all areas of industrial activity as soon as possible."

No. 85665-1-I/10

E

Ecology issued the 2020 version of the industrial stormwater general permit (2020 permit) on November 20, 2019.[4] The 2020 permit is consistent with the 2010 and 2015 permits. The 2020 permit applies to "<u>facilities</u> conducting <u>industrial activities</u> that discharge stormwater" to surface waters. (Emphasis added.) Specifically, it requires that facilities "engaged in any industrial activities in Table 1 shall apply for coverage if stormwater from the facility discharges to a surface waterbody."

Table 1 includes transportation facilities:

Transportation facilities which have vehicle maintenance activity, equipment cleaning operations, or airport deicing operations:

- Railroad Transportation

- Transit and Ground Passenger Transportation

- Truck Transportation

- Postal Service

- Water Transportation

- Air Transportation

- Petroleum Bulk Stations and Terminals

As with the 2010 permit, the Table 1 list of transportation facilities does not include the limiting language in 40 C.F.R. § 122.26(b)(14)(viii).

The 2020 permit defines a "Facility" as follows:

Facility means any establishment (including land or appurtenances thereto) that is subject to regulation under this permit.

---

[4] The 2020 ISGP became effective on January 1, 2020, and expires on December 31, 2024.

The 2020 permit defines "Industrial Activity" to include three different categories:

> Industrial Activity means (1) the 11 categories of industrial activities identified in 40 C.F.R. 122.26(b)(14)(i-xi) that must apply for either coverage under this permit or no exposure certification, (2) any facility conducting any activities described in Table 1, and (3) the activities occurring at any facility identified by Ecology as a significant contributor of pollutants. Table 1 lists the 11 categories of industrial activities identified in 40 C.F.R. 122.26(b)(14)(i-xi) in a different format.

During the public comment period for the 2020 permit, commenters including respondents Northwest Seaport Alliance, Port of Tacoma, BNSF, and Port of Seattle, requested clarifying language to limit applicability of the permit consistent with the "only those portions of the facility," as used in 40 C.F.R. § 122.26(b)(14)(vii). Consistent with its interpretation of the 2010 permit, Ecology again declined:

> Ecology made this change for the 2009 [Industrial Stormwater General Permit (ISGP)]. [Discharge Monitoring Report (DMR)] data from all transportation categories collected since 2009 demonstrates that activity on those sites beyond vehicle maintenance shops, equipment cleaning operations, and airport deicing operations is a significant contributor of pollutants leaving the site at concentrations that may reasonably be expected to cause a violation of water quality standards. Ecology will continue to regulate the entire portion of these facilities. Ecology has considered the comments and chosen not to make the suggested change to draft permit.

F

On December 19, 2019, PSA appealed the 2020 permit to the PCHB. The next day, the following industrial organizations also appealed the 2020 permit: BNSF Railway Company, the Northwest Seaport Alliance, Port of Seattle, Port of Tacoma, Pacific Merchant Shipping Association, and SSA Terminals, LLC (together, industry).[5] By

---

[5] BNSF Railway Company operates rail yards and railroad facilities throughout Washington State. Northwest Seaport Alliance, Port of Tacoma, and Port of Seattle own or lease facilities in Washington that are subject to the ISGP and together the Ports of Tacoma and Seattle are one of the largest container complexes in North America. Pacific Merchant Shipping Association is an independent association which

agreement of the parties, the PCHB consolidated the appeals. The parties identified 32 legal issues in a joint issue list.

The Port of Seattle, Port of Tacoma, Northwest Seaport Alliance, and BNSF Railway Company jointly moved for summary judgment on legal issues 11 and 12 which asked:

> 11. Does the ISGP extend or expand the coverage for transportation facilities beyond stormwater associated with "vehicle maintenance (including vehicle rehabilitation, mechanical repairs, painting, fueling, and lubrication), equipment cleaning operations, airport deicing operations, or which are otherwise identified under" 40 C.F.R. 122.26(b)(14)(i)-(vii), or (ix)-(xi)?
>
> 12. Is the purported expansion of the ISGP's scope of coverage for transportation facilities beyond the definition of discharge associated with industrial activity unreasonable or unlawful by failing to comply with the procedural requirements of NPDES permitting under federal and state law?

SSA Terminals, LLC and Pacific Merchant Shipping Association joined the motion.[6]

Regarding legal issue 11 and the scope of coverage, industry argued that Ecology never made a determination to expand the scope of coverage of the 2020 permit and that the permit does not regulate the entire facility. Industry argued that the 2020 permit is not ambiguous and thus Ecology's interpretation is not entitled to deference.

The PCHB concluded as a matter of law that by its plain language, the 2020 permit applies only to those areas of transportation facilities where vehicle maintenance activity, equipment cleaning operations, or airport deicing operations occur as defined in

---

represents owners and operators of marine terminals in Washington. SSA Terminals, LLC operates multiple marine terminals in Washington.

[6] SSA Terminals, LLC and Pacific Merchant Shipping Association also filed a motion for summary judgment on issues 11 and 12 but it was not considered by the PCHB because it was untimely filed.

40 C.F.R. § 122.26(b)(14)(viii); in other words, the 2020 permit does not cover the entire transportation facilities.  The PCHB granted industry appellants' motion for summary judgment on issue 11, declared issue 12 moot, and dismissed issues 11 and 12.  On March 28, 2022, the PCHB dismissed the case.[7]

PSA petitioned Thurston County Superior Court for judicial review of the PCHB's order under the Washington Administrative Procedure Act (APA), ch. 34.05 RCW.  By agreement of the parties, the case was transferred to this court for direct review under RCW 34.05.518.

III

A

The APA governs review of PCHB orders.  Port of Seattle v. Pollution Control Hr'gs Bd., 151 Wn.2d 568, 587, 90 P.3d 659 (2004).  If the agency decision was on summary judgment, "the reviewing court must overlay the [APA] standard of review with the summary judgment standard."  Verizon Nw., Inc. v. Emp. Sec. Dep't, 164 Wn.2d 909, 916, 194 P.3d 255 (2008).  Accordingly, facts in the record are reviewed de novo and are viewed in the light most favorable to the nonmoving party.  Verizon, 164 Wn.2d at 916.  Summary judgment is appropriate only where the undisputed material facts entitle the moving party to judgment as a matter of law.  Verizon, 164 Wn.2d at 916.  "The burden of demonstrating the invalidity of agency action is on the party asserting invalidity."  RCW 34.05.570(1)(a).

---

[7] PSA and Ecology notified the PCHB that they had reached a tentative agreement on all of PSA's issues and did not expect to proceed to hearing.  Industry entered into a settlement agreement with Ecology and the parties agreed to the dismissal of the remaining legal issues.

"Review is confined to the record before the Board." Snohomish County v. Pollution Control Hr'gs Bd., 187 Wn.2d 346, 357, 386 P.3d 1064 (2016). An agency's legal determinations are reviewed under the "error of law" standard, which allows this court to substitute its view of the law for the agency's. Puget Soundkeeper All. v. Pollution Control Hr'gs Bd., 189 Wn. App. 127, 136, 356 P.3d 753 (2015). Under this standard, questions of law and the agency's application of the law are reviewed de novo. Port of Seattle, 151 Wn.2d at 588. Rulings made on summary judgment are also reviewed de novo. Snohomish County, 187 Wn.2d at 357.

Relief may be granted based on any of the grounds listed in RCW 34.05.570. Relevant here, this court shall grant relief if it determines that (1) the PCHB has erroneously interpreted or applied the law or (2) the agency has not decided all the issues requiring resolution by the agency. RCW 34.05.570(3)(d), (f).

Because Ecology and PCHB disagree on the interpretation of the 2020 permit, it is important to note the roles assigned to each agency. In the 1970s, the legislature removed certain adjudicatory functions from Ecology and gave them to the PCHB. Ch. 43.21B RCW. The PCHB is a quasi-judicial body that provides uniform and independent review of Ecology action. RCW 43.21B.010, 110. Ecology retains rulemaking, interpretive, and enforcement functions as the agency charged with administration of water quality statutes and rules. Port of Seattle, 151 Wn.2d at 591-92. Accordingly, it is appropriate to defer to Ecology's interpretation of its own regulations and that interpretation is afforded great weight. Port of Seattle, 151 Wn.2d at 593.

B

We first address whether a general NPDES permit is reviewed as a contract or regulation. Citing the Fourth Circuit opinion in Piney Run Preservation Ass'n v. County Commissioners, 268 F.3d 255, 269-70 (4th Cir. 2001), the PCHB stated that "[f]ederal courts have held that NPDES permits are treated like any other contract. If the language of the permit is plain and capable of legal construction, the language alone must determine the permit's meaning." Puget Soundkeeper All. v. Dep't of Ecology, No. 19-089c, at 9 (Wash. Pollution Control Hr'gs Bd. Mar. 23, 2021) [https://perma.cc/5MAJ-BAQM]. Similarly, the PCHB stated that "Washington law also provides that permits are interpreted in the same manner as statutes and contracts: extrinsic evidence is not relevant where the terms stated in the permit are unambiguous, and may not be used to contradict or vary these terms." Puget Soundkeeper All., No. 19-089c, at 10 (citing Kaiser Alum. & Chem. Corp. v. Dep't of Ecology, PCHB No. 97-126 (Wash. Pollution Control Hr'gs Bd. Nov. 21, 1997) [https://perma.cc/P7VV-GGS8]). We agree with the PCHB that where the terms of an NPDES permit, whether an individual permit or general permit, are unambiguous, the plain language of the permit controls. But if the plain language is ambiguous, whether the permit is reviewed as contract or regulation makes a difference.

If a permit is reviewed as a contract and its terms are ambiguous, we determine its meaning as a matter of law using general rules of construction applicable to statutes, contracts, and other writings. In re Marriage of Gimlett, 95 Wn.2d 699, 704-05, 629 P.2d 450 (1981). We "consider 'the contract as a whole, the subject matter and objective of the contract, all the circumstances surrounding the making of the contract,

the subsequent acts and conduct of the parties to the contract, and the reasonableness of the respective interpretations advocated by the parties.'" Paradise Orchards Gen. P'ship v. Fearing, 122 Wn. App. 507, 516, 94 P.3d 372 (2004) (quoting Berg v. Hudesman, 115 Wn.2d 657, 667, 801 P.2d 222 (1990)). Extrinsic evidence could be considered "to help the fact finder interpret a contract term and determine the contracting parties' intent," but not "to show intention independent of the contract." Brogan & Anensen LLC v. Lamphiear, 165 Wn.2d 773, 775-76, 202 P.3d 960 (2009). "[T]he subjective intent of the parties is generally irrelevant if the intent can be determined from the actual words used." Brogan, 165 Wn.2d at 776.

But if a permit is reviewed as a regulation or statute and its terms are ambiguous, courts give "great weight" to the agency's interpretation of an ambiguous statute "which falls within the agency's expertise," provided that interpretation does not conflict with the statute's language or underlying intent." Puget Soundkeeper All., 189 Wn. App. at 136-37 (quoting Pub. Util. Dist. No. 1 of Pend Oreille County v. Dep't of Ecology, 146 Wn.2d 778, 790, 51 P.3d 744 (2002)). The same deference is given to an agency's interpretation of its own regulations. "Because Ecology is the agency designated by the legislature to regulate the State's water resources, . . . this court has held that it is Ecology's interpretation of relevant statutes and regulations that is entitled to great weight." Port of Seattle, 151 Wn.2d at 593.

The PCHB is correct that some federal courts have reviewed individual NPDES permits as contracts. For example, in Nw. Env't Advocs. v. City of Portland, 56 F.3d 979 (9th Cir. 1995), the court reviewed the City of Portland's individual NPDES permit and whether it covered discharges from combined sewer overflows. The court did not

analyze whether the permit was more akin to a regulation or contract, but simply stated, without citation, that "we review the district court's interpretation of the [NPDES permit] as we would the interpretation of a contract or other legal document." Nw. Env't Advocs., 56 F.3d at 982.[8]  Because an individual NPDES permit can be the product of negotiation between the agency and discharger, treating such a permit like a contract may be appropriate.

Our Supreme Court considered an ambiguous individual NPDES permit in ITT Rayonier, Inc. v. Dep't of Ecology, 91 Wn.2d 682, 586 P.2d 1155 (1978).  The court explained:

> We agree that the permit itself is ambiguous.  However, it was error here for the PCHB to look only to DOE's intent to resolve this ambiguity.  Although the general rule may be that construction of administrative orders depends only upon the intent or purpose of the issuing agency, . . . under the circumstances here that rule does not apply.  Because the portion of the permit at issue here—footnote f—was the product of negotiation and agreement between the parties, the intent of both parties, and not just the agency, is relevant.  The footnote provision is in the nature of a consent decree or a negotiated settlement, and contract principles of construction are properly applied.

ITT Rayonier, 91 Wn.2d at 686-87 (internal citations omitted).

But in contrast, a general NPDES permit is not the product of a negotiation between the agency and an individual discharger.  A general NPDES permit covers a number of similar dischargers in a wide geographic area.  And, as discussed above, it is the product of an administrative rulemaking process, including public notice, public

---

[8] Similarly, in Piney Run Preservation, the Fourth Circuit considered an individual NPDES permit issued for a county's wastewater facility and interpreted the permit as a contract, without citing any analysis.  268 F.3d at 269.

hearing, and an administrative appeal process. WAC 173-226-130 to -180. Individual discharges can opt into coverage under the permit, but do not negotiate its terms. WAC 173-226-200.

In Alaska Community Action on Toxics v. Aurora Energy Services, LLC, 765 F.3d 1169 (9th Cir. 2014), the Ninth Circuit considered whether a discharger's nonstormwater discharge of coal was covered by a general NPDES permit. The court explained that general NPDES permits are interpreted as a regulation because they are issued according to an administrative rulemaking process. 765 F.3d at 1172 (citing Nat. Res. Def. Council v. U.S. E.P.A., 279 F.3d 1180 (9th Cir. 2002); OFF. OF WATER ENF'T & PERMITS, U.S. ENV'T PROT. AGENCY, EN-336, GENERAL PERMIT PROGRAM GUIDANCE 11 (Feb. 1988) ("general permits are rulemakings"), https://nepis.epa.gov/Exe/ZyPDF.cgi/P100FD8U.PDF?Dockey=P100FD8U.PDF [https://perma.cc/AFV3-3EHM]).

We agree with Alaska Cmty. Action. General NPDES permits—like the 2020 ISGP—are issued according to rulemaking procedures, have broad applicability, and therefore should be interpreted as a regulation. 765 F.3d at 1172.

VI

We turn next to the terms of the 2020 permit. The PCHB concluded that the 2020 permit was unambiguous and did not apply to transportation facilities beyond stormwater associated with "vehicle maintenance (including vehicle rehabilitation, mechanical repairs, painting, fueling, and lubrication), equipment cleaning operations, [or] airport deicing operations." PSA and Ecology agree that the 2020 permit is unambiguous but, contrary to the PCHB's interpretation, argue that because the permit

does not include the limiting language in 40 C.F.R. § 122.26(b)(14)(viii), the permit applies to the entire transportation facility. We agree with PSA and Ecology.

When interpreting agency regulations, courts apply the same principles used to construe statutes. Puget Soundkeeper All. v. Dep't of Ecology, 191 Wn.2d 631, 644, 424 P.3d 1173 (2018). The "'fundamental objective'" of statutory interpretation is to "'ascertain and carry out the Legislature's intent.'" State v. Valdiglesias LaValle, 2 Wn.3d 310, 317-18, 535 P.3d 856 (2023) (quoting Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 9, 43 P.3d 4 (2002)). If a statute's meaning is plain on its face, courts will give effect to that meaning as an expression of legislative intent. Valdiglesias LaValle, 2 Wn.3d at 318. "If the statute is susceptible to more than one reasonable interpretation after this inquiry, it is ambiguous." Valdiglesias LaValle, 2 Wn.3d at 318. A regulation is not ambiguous merely because another interpretation is possible. Valdiglesias LaValle, 2 Wn.3d at 318.

To determine the "plain meaning" of a statute, courts look to the text, the context of the statute, related statutory provisions, and the statutory scheme as a whole. Valdiglesias LaValle, 2 Wn.3d at 318. Interpretations must give meaning to every word in the statute or regulation. Wash. Cedar & Supply Co., Inc. v. Dep't of Lab. & Indus., 137 Wn. App. 592, 599, 154 P.3d 287 (2007). Undefined terms are given their plain and ordinary meaning unless a contrary legislative intent is indicated. Valdiglesias LaValle, 2 Wn.3d at 318. Courts "employ traditional rules of grammar in discerning the plain language of the statute." Valdiglesias LaValle, 2 Wn.3d at 318 (quoting State v. Bunker, 169 Wn.2d 571, 578, 238 P.3d 487 (2010)). "Our goal is to achieve a harmonious total statutory scheme to avoid conflicts between different provisions."

<u>Wash. Cedar & Supply</u>, 137 Wn. App. 592 (citing <u>Lee Cook Trucking & Logging v. Dep't</u> <u>of Lab. & Indus.</u>, 109 Wn. App. 471, 481, 36 P.3d 558 (2001)).

Looking first to the plain language of the 2020 permit, it provides that the permit "applies to facilities conducting industrial activities." The permit defines industrial activity to include three different categories:

> (1) the 11 categories of industrial activities identified in 40 C.F.R. 122.26(b)(14)(i-xi) that must apply for either coverage under this permit or no exposure certification, (2) any facility conducting any activities described in Table 1, and (3) the activities occurring at any facility identified by Ecology as a significant contributor of pollutants. Table 1 lists the 11 categories of industrial activities identified in 40 C.F.R. 122.26(b)(14)(i-xi) in a different format.

The first category of industrial activities requires permit coverage for any facility considered to engage in industrial activity under the federal regulation. Transportation facilities are covered under category 8. 40 C.F.R. § 122.26(b)(14)(viii). As discussed above the federal language limits the scope of coverage to "only those portions" of the facility that conduct vehicle maintenance, equipment cleaning, or airport operations.

The second category of industrial activities require permit coverage for "any facility conducting any activity described in Table 1." "Facility" means "any establishment (including land or appurtenances thereto) that is subject to regulation under this permit." Table 1 includes transportation facilities that conduct vehicle maintenance, equipment cleaning, or airport deicing operation. Reading these two provisions together, it is plain that the second category requires coverage for the land and appurtenances at any transportation facility that conducts vehicle maintenance, equipment cleaning, or airport deicing operations—that is, the entire footprint of the transportation facility. A facility may be subject to coverage under the permit because it

belongs to one of the "categories" of facilities listed in the C.F.R. or, because the facility—including its land and appurtenances—conducts one of the "activities" described in Table 1 which does not specifically limit transportation facility industrial activity to any one area of the facility.[9]

The PCHB's interpretation rendered the second category for the definition of "industrial activities" superfluous by concluding that, like the first category, it was limited by the "only those portions" language found in the federal regulation. To reach this conclusion the PCHB ignored the expansive "any facility" language in the second category, and then read the "only those portions" language into the definition's clause, even though those words do not exist anywhere in the 2020 permit. The PCHB erred in inserting words that did not exist into the permit's definition, which had the effect of also rendering the second category superfluous. Rest. Dev., Inc. v. Cananwill, Inc., 150 Wn.2d 674, 682, 80 P.3d 598 (2003) (a court must not add words to a statute and must construe statutes such that all of the language is given effect, and no portion is rendered meaningless or superfluous).

The PCHB also concluded that the last sentence of the permit's definition of industrial activities—"Table 1 lists the 11 categories of industrial activities identified in 40 C.F.R. 122.26(b)(14)(i-xi) in a different format"—should be read into the second category of facilities. But doing so still reads language into the definition and renders the second category superfluous with the first category. A reasonable interpretation of

---

[9] "Categories" are defined as any of several fundamental and distinct classes to which entities belong. MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/category (last visited March 18, 2024). "Activities" are defined as behavior or actions of a particular kind. MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/activities (last visited March 18, 2024).

the last sentence is that the categories of facilities—transportation facilities, recycling facilities, etc.—are part of, or included, in Table 1, but in a different general makeup or arrangement. This clarification makes sense given the inconsistency between the number of federal categories of facilities (11) and the number of activities described in Table 1 (32). The definition does not say that Table 1 "incorporates" or is "identical to" the federal categories of facilities. From other provisions in the 2020 permit, it is clear that Ecology explicitly incorporates by reference when it wants to.

Reading the permit according to Ecology's interpretation gives effect to each of the three categories of industrial activities in the definition while also harmonizing the last sentence with the terms so as not to add or remove language.[10] Read together, if a transportation facility requires coverage under the 2020 permit because it conducts vehicle maintenance, equipment cleaning, or airport deicing operations, coverage under the permit applies to the entire transportation facility, not just limited areas.

---

[10] While not necessary for our conclusion, it appears Ecology has also determined that the third category of industrial activities also applies. In the Fact Sheet for the 2020 permit, Ecology "determined that stormwater discharges may cause a violation of water quality standards for a variety of pollutant parameters." During public comment for the 2020 Permit, owners and operators of transportation facilities commented on Ecology's decision to continue its expanded scope of coverage. The owners and operators asked that Ecology clarify and limit the scope of coverage by adding the limiting language from category 8. Ecology declined to make the suggested change and then explained its determination that stormwater discharges from transportation facilities are significant contributors of pollutants at concentrations that were expected to cause a violation of water quality standard:

> DMR data from all transportation categories collected since 2009 demonstrates that activity on these sites beyond vehicle maintenance shops, equipment cleaning operations, and airport deicing operations is a significant contributor of pollutants leaving the site at concentrations that may reasonably be expected to cause a violation of water quality standards. Ecology will continue to regulate the entire portion of these facilities. Ecology has considered the comments and chosen not to make the suggested change to [the] draft permit.

VII

But even if we decided the 2020 permit terms are ambiguous, our conclusion remains the same: the 2020 ISGP applies to entire transportation facilities.[11]  Courts give "great weight" to the agency's interpretation of an ambiguous statute "which falls within the agency's expertise," provided that interpretation does not conflict with the statute's language or underlying intent."  Puget Soundkeeper All., 189 Wn. App. at 136-37 (quoting Pub. Util. Dist. No. 1, 146 Wn.2d at 790).  The same deference is given to an agency's interpretation of its own regulations.  Port of Seattle, 151 Wn.2d at 593.  As discussed earlier, we interpret general NPDES permits as we would a regulation.

The record reflects that since 2010 Ecology has interpreted the ISGP to cover entire transportation facilities that have vehicle maintenance, equipment cleaning, or airport deicing without limiting industrial activity to only certain areas.  For example, in response to an inquiry from several ports as to scope, Ecology clarified that once a facility has permit coverage, the permit's sampling, inspection, and stormwater management practices are required in all areas of industrial activity.  An Ecology

---

[11] We recognize that two different U.S. Federal District Courts have found extent of coverage for transportation facilities in the 2010 and 2020 permits ambiguous.  We are mindful, however, that a regulation is not ambiguous merely because another interpretation is possible.  Valdiglesias LaValle, 2 Wn.3d at 318.

In Puget Soundkeeper Alliance. v. BNSF Railway Co., No. C09-1087-JCC, 2011 WL 13233168, at *1-2 (W.D. Wash. Apr. 11, 2011) (court order), the court interpreted the 2010 Permit, which it had determined to be ambiguous, as it would a regulation and thus relied on Ecology's interpretation that the omission was "a significant policy question and that the intent was to expand the geographical scope of permit coverage."  The court concluded that discovery was relevant to portions of the facility beyond those areas where vehicle maintenance and equipment cleaning occur and granted the plaintiff's motion.  BNSF Ry. Co., 2011 WL 13233168, at *2.

In Puget Soundkeeper Alliance v. APM Terminals Tacoma, LLC, No. C17-05016 BHS, 2020 WL 6445825, at *10 (W.D. Wash. Nov. 3, 2020) (court order), the court determined the plain language of the 2020 permit incorporates the federal regulation and the "only those portions" limiting definition.  Accordingly, the court rejected Ecology's interpretation and granted the Port of Tacoma's motion that the "clear language of the ISGP" included the limiting language.  APM Terminals, 2020 WL 6445825 at *10.

supervisor confirmed that in 2009 the Water Quality Program management team discussed the expansion beyond what the federal regulation required and that the omission of the "only those portions" language was intentional.

Ecology restated this interpretation again in issuing the 2020 permit. In response to public comments on the draft 2020 permit, Ecology explained that based on data since 2009 the activity on transportation facilities beyond the vehicle maintenance shops is a significant contributor of pollutants at concentrations that may be reasonably expected to cause violation of water quality standards. Such a determination brings those facilities under coverage of the ISGP—regardless of the federal categories or Table 1—according to the ISGP's definition of industrial activity.

In 2009, Ecology made a policy decision to omit the limiting language from Table 1 so as to apply permit requirements to all areas of transportation facilities where industrial activity occurs. Additionally, the determination that activity at such facilities is a significant contributor of pollutants supports Ecology's interpretation. The scope of coverage at transportation facilities was explained to the public when the 2010 permit was proposed and Ecology's interpretation has remained consistent in the last two versions of the ISGP.

Washington's general permit program was established to be applicable to "the discharge of pollutants, wastes, and other materials to waters of the state" and designed to satisfy the requirements of both the CWA and the WPCA. WAC 173-226-010. The purpose of the CWA is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. 33 U.S.C. § 1251. The purpose of the WPCA is to maintain the highest possible standards to insure the purity of all waters of Washington

and, to that end, require the use of all known and available methods by industry to prevent and control water pollution. RCW 90.48.010. Because Ecology's interpretation does not conflict with the permit's language nor the underlying purpose of the CWA and the state's WPCA, Ecology's interpretation of its own permit is entitled to great weight.

Thus, even if the permit is ambiguous, we interpret it to mean that if a transportation facility requires coverage under the 2020 permit because it conducts vehicle maintenance, equipment cleaning, or airport deicing operations, coverage under the permit applies to the entire transportation facility, not just limited areas.

We conclude that the PCHB erred as a matter of law. We reverse the PCHB's order on summary judgment on legal issue 11 and instead hold that the 2020 permit applies to all areas of industrial activity at covered transportation facilities, not just the limited areas specified in EPA's regulation.

VIII

Because the PCHB granted summary judgment in favor of industry on legal issue 11, the PCHB concluded legal issue 12 was moot. PSA does not assign error to PCHB's ruling on legal issue 12 and instead argues that if this court reaches the issue, it should find that Ecology's actions were reasonable and supported by substantial evidence. Conversely, industry asks us to remand to the PCHB for full consideration of legal issue 12. Industry relies on a recent decision by Division Three of this court, Burbank Irrigation District #4 v. Department of Ecology, 27 Wn. App. 2d 760, 534 P.3d 833 (2023). We agree with industry.

Under the APA, this court may grant relief if the agency has not decided all issues requiring resolution by the agency. RCW 34.05.570(3)(f). Courts have

interpreted this avenue of relief to require, as a threshold matter, that the agency decide an issue before this court can reach the merits of the issue on appeal. Suquamish Tribe v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd., 156 Wn. App. 743, 775, 235 P.3d 812 (2010). For this reason, we do not address the merits of PSA's argument on legal issue 12 because the PCHB did not decide it.

Legal issue 12 asks whether the omission of limiting language in industrial activity for transportation facilities in Table 1 and the resulting expansion of coverage was unreasonable or unlawful by failing to comply with procedural requirements. Because we disagree with the PCHB's interpretation of the 2020 permit, the question presented by legal issue 12 remains unresolved and is no longer moot. "Where an issue is not decided but remains relevant to the challenged action, the appropriate remedy is to remand for the agency to exercise its judgment and make a decision." Burbank Irrigation, 534 P.3d at 845 (quoting Suquamish Tribe, 156 Wn. App. at 778).

We reverse and set aside the PCHB's order on legal issues 11 and 12. We remand to the PCHB to, consistent with this opinion, grant summary judgment on legal issue 11 in favor of Ecology and PSA, and reach the merits of legal issue 12.[12]

Reversed and remanded.

Mann, J.

WE CONCUR:

Chung, J.

Bowman, J.

---

[12] RCW 34.05.574.